## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00902-COA

**CASSANDRA LEONARD**                                                      **APPELLANT**

**v.**

**MICHAEL SHAY PATE**                                                       **APPELLEE**

DATE OF JUDGMENT:               07/03/2023
TRIAL JUDGE:                    HON. JACQUELINE ESTES MASK
COURT FROM WHICH APPEALED:      MONROE COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:         CANDACE COOPER BLALOCK
ATTORNEY FOR APPELLEE:          EDWIN HUGHES PRIEST
NATURE OF THE CASE:             CIVIL - CUSTODY
DISPOSITION:                    AFFIRMED - 05/13/2025
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., LAWRENCE AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.    On July 3, 2023, the Chancery Court of Monroe County entered its "Final Judgment for Modification of Child Custody and Other Relief" granting Cassandra Leonard and Michael Shay Pate joint legal custody of their child, G.P.P.,[1] with physical custody granted to Pate subject to the visitation rights of Leonard. Leonard appealed.

## FACTS AND PROCEDURAL HISTORY

¶2.    Leonard and Pate share one child, G.P.P., born in February 2016. Although they never married, Leonard and Pate stipulated to G.P.P.'s paternity in April 2016, and an order was entered providing for child support. Visitation and custody were not addressed in that order.

---

[1] We use initials to protect the minor's identity.

Leonard and Pate had an on-again, off-again relationship for several years after G.P.P.'s birth. In 2018, Leonard filed a complaint seeking sole physical and legal custody of G.P.P., and for modification of child support. In September 2018, the parties entered an order agreeing to share joint physical and joint legal custody of G.P.P, and set forth a custody schedule and child support responsibilities.[2] The parties finally separated in January 2019.

¶3.     Just over a year later, on February 13, 2020, Leonard filed a petition to modify child custody, child support, and for emergency custody of G.P.P. Leonard alleged that G.P.P. was being physically abused in Pate's home, that Pate was using illegal controlled substances, that Pate exhibited behavior that "infers he is not well," and that Pate was placing G.P.P. "in danger of imminent harm due to an unstable environment." Leonard also alleged that she had been assaulted by Pate. With no notice to Pate, on that same date, Leonard was granted emergency temporary legal and physical custody of G.P.P. In the order, Pate was "enjoined from harassing, contacting, and coming within 1,500 feet" of Leonard or G.P.P. Although the matter was set for review on February 20, 2020, no review occurred on that date, and it was over a year before the review took place. No reasons for the delay appear in the record, but as a result of the delay in review, Pate did not see G.P.P. for approximately fourteen months.

¶4.     On March 11, 2020, Pate filed his "Response to Petition to Modify Child Custody and Other Relief and Counter-Petition for Contempt, Modification and Other Relief." In his counter-petition, Pate sought permanent legal and physical custody of G.P.P. and other relief.

---

[2] The record reflects that at the time of the September 2018 order, Pate and Leonard had reconciled and resumed a romantic relationship.

In a separate motion filed that same date, Pate asked the chancery court to set aside the "Emergency Custody Order" entered on February 13, 2020.

¶5.    Over a year later, on April 9, 2021, after a hearing and after being advised that the parties had reached an interim agreement, the chancellor entered an order requiring Pate to submit to a drug test as previously ordered in the emergency custody order. The order provided that if Pate tested negative for all substances except marijuana, then he could take immediate custody of G.P.P., and the parties could resume the week-to-week custody schedule in place prior to the emergency custody order. Pate did not test positive for any substances other than marijuana, and the week-to-week joint custody resumed.

¶6.    In April 2021, an agreed order was entered appointing a new guardian ad litem (GAL), and a trial was set for July 28-29, 2021. The GAL requested a continuance for the July setting "because [Leonard] had not complied with the GAL requirements and had failed to contact the office of the GAL to complete intake procedures."[3] The GAL report states that intake procedures were completed in early August, and there had to be a decision on where G.P.P. would attend school. Leonard had G.P.P. registered in Alabama, where she was living with her boyfriend Chaz Carr, and Pate had him registered in Pontotoc County.[4] The GAL recommended that G.P.P. continue to live with Pate and attend school in Pontotoc County. In response, Leonard and her mother traveled to Pontotoc County late on the evening of

_____

[3] The GAL report notes that Leonard told her that they had attempted to contact her but had been given the wrong telephone number. The GAL states that this is simply not true.

[4] The record reflects that during the relevant time frame, Leonard moved several times within Mississippi and also lived for several periods of time in Alabama with Carr, whom she married in August 2021.

August 11, 2021, and attempted to remove G.P.P. from Pate's home. Law enforcement had to be called.

¶7. The next day, on August 12, 2021, Pate filed a "Motion for Emergency Custody and Other Relief." At the time the motion was filed, G.P.P. was under the care and control of Pate. Pate's motion cited the attempts by Leonard to take G.P.P. from his home and alleged that he feared Leonard would remove G.P.P. from Mississippi. Pate further cited Leonard's marriage to Carr, who Pate alleged had a questionable background, and that G.P.P. should not be in his care. As a result, Pate requested an emergency order asking that Leonard's visitation be suspended and that he be awarded emergency and temporary custody of G.P.P., along with other relief.

¶8. Pate's motion was heard on August 13, 2021, and Pate was granted temporary legal and physical custody of G.P.P. The order further provided that neither Leonard nor her mother could have any contact with G.P.P. until another hearing could be held within thirty days. A hearing was set for September 1, 2021, but was continued until September 7, 2021, when an agreement was reached between the parties. In the order entered on September 17, 2021, Pate was given temporary physical custody of G.P.P., with the parties sharing joint legal custody. Although Leonard was given visitation rights, she could not take G.P.P. out of state, and the visitation had to take place in her mother's home. Further, Leonard could not allow her then-husband Chaz Carr to have contact with G.P.P. Neither party was required to pay the other party child support, and the matter was set for a hearing on the merits on October 25, 2021.

¶9.   The parties continued to litigate over the custody of G.P.P. over the next twenty months. The last testimony heard by the chancellor was on April 13, 2023. The GAL report was filed on May 26, 2023. The chancellor entered her final judgment on July 3, 2023. Aggrieved with her decision, Leonard appealed, citing two assignments of error.

## STANDARD OF REVIEW

¶10.   In the case of modification of child custody, our standard of review is set out in *Riley v. Heisinger*, 302 So. 3d 1243, 1254-55 (¶¶41-46) (Miss. Ct. App. 2020):

> "To modify child custody, 'the non-custodial party must prove: (1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this change adversely affects the child's welfare; and (3) that the child's best interest mandates a change of custody.'" *Strait v. Lorenz*, 155 So. 3d 197, 203 (¶20) (Miss. Ct. App. 2015) (quoting *A.M.L. v. J.W.L.*, 98 So. 3d 1001, 1013 (¶24) (Miss. 2012)). Thus, the chancellor must first determine whether there has been a material change in circumstances that adversely affects the child. If the chancellor makes such a finding, "the chancellor must then perform an *Albright* analysis to determine whether modification of custody is in the child's best interest." *Id*.
> . . . .
>
> As noted just above, if the chancellor finds that there has been a material, adverse change in circumstances, "the chancellor must then perform an *Albright* analysis to determine whether modification of custody is in the child's best interest." *Strait*, 155 So. 3d at 203 (¶20). "A chancellor's custody decision will be reversed only if it was manifestly wrong or clearly erroneous, or if the chancellor applied an erroneous legal standard." *Smith v. Smith*, 97 So. 3d 43, 46 (¶7) (Miss. 2012). "[T]his Court cannot reweigh the evidence and must defer to the chancellor's findings of the facts, so long as they are supported by substantial evidence." *Hall v. Hall*, 134 So. 3d 822, 828 (¶21) (Miss. Ct. App. 2014). Thus, the issue on appeal is not whether this Court "agrees with the chancellor's ruling," but only whether "the chancellor's ruling is supported by credible evidence." *Hammers v. Hammers*, 890 So. 2d 944, 950 (¶14) (Miss. Ct. App. 2004).
>
> "[T]he polestar consideration in child custody cases is the best interest and welfare of the child." *Albright* [*v. Albright*], 437 So. 2d [1003,] 1005 [(Miss.

5

1983)]. The chancellor's evaluation of the child's best interest must consider the following factors: (1) the age, health, and sex of the child; (2) which parent has had "continuity of care"; (3) the parties' "parenting skills"; (4) the parties "willingness and capacity to provide primary child care"; (5) the parties' employment responsibilities; (6) the parties' "physical and mental health and age"; (7) the "emotional ties of parent and child"; (8) the parties' "moral fitness"; (9) "the home, school and community record of the child"; (10) the child's preference, if the child is at least twelve years old; (11) the stability of the home environment and employment of each party; and (12) any "other factors relevant to the parent-child relationship" or the child's best interest. *Id.*

The chancellor must address each *Albright* factor that is applicable to the case, *Powell v. Ayars*, 792 So. 2d 240, 244 (¶10) (Miss. 2001), but the chancellor need not decide that each factor favors one parent or the other. *Weeks v. Weeks*, 989 So. 2d 408, 411 (¶12) (Miss. Ct. App. 2008). Nor does *Albright* require the chancellor to award custody "to the parent who 'wins' the most factors." *Blakely v. Blakely*, 88 So. 3d 798, 803 (¶17) (Miss. Ct. App. 2012). "[T]he chancellor has the ultimate discretion to weigh the evidence the way he sees fit." *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (¶36) (Miss. 2003). We review the chancellor's application of the factors for manifest error, giving deference to the weight that he assigned each factor. *Smith v. Smith*, 206 So. 3d 502, 513 (¶24) (Miss. 2016).

**ANALYSIS**

¶11.    Leonard does not challenge the chancellor's finding that a material change in circumstances had occurred that had adversely affected G.P.P.'s welfare. Her challenge on appeal relates only to the third prong of the test: whether the best interest of the child mandates a change in custody. To this end, Leonard's assignments of error on appeal both relate to whether the chancellor properly evaluated all the *Albright* factors in rendering the final judgment.

¶12.    The chancellor devoted nearly four pages of the final judgment setting out her consideration of the *Albright* factors and making specific findings as to each one. The chancellor found five factors either favored or slightly favored Pate and found four others

6

neutral.[5] She then found that it was in G.P.P.'s best interest for Pate and Leonard to share joint legal custody, with his physical custody awarded to Pate. The chancellor pointed out that her conclusion was consistent with the GAL's recommendation.

¶13.    We address each of the *Albright* factors below:

    *(1) Age, Health, and Sex of the Child*

¶14.    The chancellor found that G.P.P. was seven years old at the time of trial and in good health, generally. However, the chancellor also found that G.P.P. had respiratory concerns and behavioral issues such as ADD and ADHD.  Based upon "credible proof," the chancellor found that Pate had been more attentive in this regard. The GAL found that although Leonard suffers from asthma and breathing issues herself, she had smoked in G.P.P.'s presence his entire life. The GAL report highlights conflicts between Leonard and Pate over medication prescribed for G.P.P. Pate took G.P.P. to a pediatrician who prescribed medication for G.P.P. only to have Leonard take G.P.P. to another pediatrician who took him off the medication. The chancellor found that this factor slightly favors Pate. Based upon the evidence, we cannot say that the chancellor was manifestly wrong.

    *(2) Continuity of Care Prior to Separation*

¶15.    On appeal, Leonard points to the fourteen-month period where Pate was not involved with G.P.P. However, the GAL found that the fourteen-month lapse in Pate's contact with G.P.P. was largely due to Leonard's emergency custody order entered in February 2020, which the GAL found was "at best, obtained by misrepresentation." In any event, Pate has

---

[5] The preference-of-the-child factor does not apply in this case because the child was under age twelve. *See Riley*, 302 So. 3d at 1255 (¶45).

had sole custody of G.P.P. since September 17, 2021. At the time of the chancellor's final judgment, that covered a period of more than twenty-one months. The chancellor found that G.P.P. had spent extended periods of time with both Pate and Leonard, and as a result, found that this factor favored neither party. Based upon the evidence, we cannot find that the chancellor erred in this regard.

*(3) Best Parenting Skills and Willingness and Capacity to Provide Child Care*[6]

¶16.    The chancellor, after considering positive and negative attributes of each parent, found these factors favored neither party. Because the GAL found both factors to favor Pate, Leonard argues on appeal that the "evidence before the Court did not support this factor being favorable to the father." This argument is unpersuasive given that the chancellor found these factors favored neither party.

*(4) Employment of the Parents and Responsibilities of that Employment*

¶17.    The chancellor found that both parties worked full-time. Pate operated his family's local swimming pool business and worked daytime hours. Leonard's employment had changed over the course of litigation. Her present employment was over an hour from her residence and she worked the night shift. Leonard argues that Pate had split from his wife, who was assisting him in the care of G.P.P. while Pate was working. The chancellor also found that both parties required assistance from others in their care of G.P.P. The chancellor found this factor favored Pate. The chancellor's finding on this factor is not contrary to the evidence.

---

[6] The chancellor combined two separate *Albright* factors under this heading.

*(5) Physical and Mental Health and Age of the Parents*

¶18. The chancellor found this factor to slightly favor Pate. In her brief, Leonard contends, without citing any record evidence, that "the weight of the evidence showed the parties being equal." The chancellor stated that both parties were in good physical health, but noted both have a history of behavioral issues. The chancellor further noted that Pate treats his condition with medication, but Leonard had declined or discontinued her medication. We find that there is record support for the chancellor's evaluation of this factor.

*(6) Emotional Ties of Parent and Child*

¶19. Leonard's brief does not address this factor. The chancellor found that the proof established that both parties love G.P.P. and that he loves both parties. The chancellor found that this factor did not favor either Pate or Leonard. There was no error in this finding.

*(7) Moral Fitness of the Parents*

¶20. The chancellor found this factor to favor neither party. The chancellor noted that both parties "pointed out faults of the other." The chancellor noted that G.P.P. had been exposed to inappropriate language and social media while with Leonard and that Leonard had admitted to the illegal use of marijuana. The chancellor also recognized that Pate had a history of drug use that prevented him from having contact with G.P.P. for an extended period of time. The GAL was apparently asked by Leonard and her mother to talk to Pontotoc County Sheriff Leo Mask, who they advised "knows all about [Pate]" and "hates [Pate]." The GAL did speak with him and found that Pate had turned his life around. The GAL further pointed out that Pate had submitted to several drug screens and that those screens did not

"raise any concerns." The GAL, whose report was considered by the chancellor, found that while any type of drug use as alleged by Leonard was troubling to her, she "does not have any information which leads her to believe that [Pate] is using illicit drugs." We cannot say that the chancellor was manifestly wrong in finding that this factor favored neither party.

*(8) The Home, School, and Community Record of the Child*

¶21. The chancellor found this factor "only slightly" favors Pate. The court noted that G.P.P. was attending Pontotoc City schools where Pate lives. The chancellor also found that G.P.P. was attending church with Pate and had developed relationships with many of Pate's extended family members who live nearby. While the court noted that Leonard had moved back near her mother, the evidence did not show that G.P.P. was more involved with Monroe County than Pontotoc County. In her brief, Leonard alleges that G.P.P. was "excessively tardy and absent" from school while in Pate's care. There is conflicting testimony concerning G.P.P.'s readiness for kindergarten in his first year and conflicting testimony about who was to blame. However, while with Pate for his second year of kindergarten, G.P.P.'s performance improved considerably. The chancellor was the trier of fact, and her findings were not manifestly wrong.

*(9) Preference of the Child*

¶22. This factor was not applicable in this case due to G.P.P.'s age. *See supra* note 6.

*(10) Stability of home environment and employment of each parent and other factors relevant to the parent-child relationship.*

¶23. The chancellor found this factor slightly favored Pate. Leonard makes no convincing argument that the chancellor erred in finding that she had changed employment many times.

10

She gave inconsistent testimony regarding her relationship with Carr and the moves to and from Mississippi to Alabama. The chancellor found that Pate had maintained the same residence and employment "throughout."[7]

*(11) Other Factors Relevant to Parent-child Relationship*

¶24.    Under this provision, the chancellor stated that the domestic violence presumption was not triggered in this case. The court did acknowledge that there was clear animosity between the parties, "particularly with regard to [Leonard] toward [Pate]." The court noted that Pate had another child who was G.P.P.'s half-sibling and with whom G.P.P. had established a relationship. The chancellor also noted that Pate's mother and sisters have contributed to the stability in G.P.P.'s life.

¶25.    The chancellor conducted hearings regarding the pleadings in this matter on fourteen different dates between February 13, 2020, and April 13, 2023. In the final judgment entered on July 3, 2023, after finding that a material and substantial change in circumstances adverse to G.P.P.'s best interest had occurred, the chancellor set forth her consideration of each *Albright* factor.

¶26.    In Leonard's appellate brief, she essentially asks this Court to reweigh the *Albright* factors. Even in the concluding portion of her brief where she challenges the chancellor's consideration of the "continuity of care" factor, she makes no meaningful argument, but states only that the "uncontradicted proof that the minor child had been primarily with Cassandra Leonard until the emergency order was granted in August of 2021." However, this

---

[7] The record reflects that Pate notified the chancery court prior to the end of testimony that he had relocated within Pontotoc County.

statement ignores the fact that G.P.P.'s sole physical custody had been with Pate after that date until the final judgment was entered. The evidence also shows that there were periods in G.P.P.'s life where his parents were together and periods where they shared custody every other week.

¶27. It is clear from the chancellor's order that she properly considered all the *Albright* factors. We emphasized in *Divers v. Divers*, 856 So. 2d 370, 376 (¶27) (Miss. Ct. App. 2003), that "[t]he *Albright* factors are not to be applied in the manner of a score sheet or mathematical formula; rather, "[t]he [c]hancellor may give special weight to one, two, or several factors to determine the outcome." In *Morland v. Morland*, 396 So. 3d 501, 507 (¶11) (Miss. Ct. App. 2024), we explained that "[a]ll the *Albright* factors are important, but the chancellor has the ultimate discretion to weigh the evidence the way he sees fit. *Vassar v. Vassar*, 228 So. 3d 367, 375 (¶27) (Miss. Ct. App. 2017). This Court will not 'second guess' a chancellor's custody decision absent some legal error or manifestly erroneous factual findings. *Culver v. Culver*, 371 So. 3d 726, 731 (¶23) (Miss. Ct. App. 2023)." We find no reversible error in the chancellor's consideration of the *Albright* factors or in the application of those factors to award joint legal custody of G.P.P. to Leonard and Pate, with physical custody being awarded to Pate.

¶28. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., McDONALD, LAWRENCE, McCARTY, WEDDLE AND ST. PÉ, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**